Good morning, your honors, brother and sister counsel, and other members and staff of the court. Thank you for the opportunity of allowing me to appear today. I represent the plaintiff and the appellant in this matter, Sgt. Jeffrey Sarver, and we believe that there are three grounds upon which this court should reverse the lower court's decision dismissing my client's claims under the anti-SLAPP statute. I'll just touch briefly on the first two. One, I don't believe that California law should apply. I believe it is New Jersey, and I believe the district court made an error in applying the California law. And just as a bit of procedural background on that point, this case was filed in New Jersey, and the defendants never raised or asserted any defense under California law. They never even mentioned the hint or the instance of this anti-SLAPP statute being applicable. So after the case was transferred was the first that this was ever raised. But in any event, I believe that New Jersey follows the restatement second of conflicts of law, which says the presumption is the injury, the location of injury is the presumptive locale of the claim. There's also the question of domicile. Domicile is an important consideration, is it not? Well, I believe that it can be an important consideration, but under the restatement that is followed by New Jersey, as well as what is consistent with the restatement in Section 150 in the multi-state defamation, the court in New Jersey follows the place of injury. And at the time that this movie was released, my client was stationed in New Jersey. Now, the Supreme Court has decided in the Hustler case, the Keaton v. Hustler, that a multi-state defamation case can be brought virtually anywhere. Because if you have a multi-state publication, where do you pick a locale? And in the Hustler case, the plaintiff brought their suit in a particular jurisdiction, and then the defendant said, well, no, this jurisdiction, you can't bring it here, or this would be time-barred. And the Supreme Court said, no, that's not how it works. In a multi-state publication case, you have the plaintiff has a choice of form, which could be perhaps one of many jurisdictions. But in any event, I believe that the case was properly filed in New Jersey, and that New Jersey law should have applied, and that the motions were untimely. Now, do you represent that his domicile at the time he filed the lawsuit was New Jersey? Yes, Your Honor. At the time he filed the lawsuit, it was New Jersey. And that would be the location of his injury. And as the restatement says, you look at what your reputational harm is at the time that the defamation occurs. So did he evince an intent to remain in New Jersey? Is he in New Jersey now, by the way? No, he's not in New Jersey. Where is he now? I believe he's in Wisconsin now, Your Honor. Okay. So did he show any of the indicia of choosing New Jersey to be his domicile? Because that's what the district court was considering. Well, I think for a member of the services, I think that that's a difficult question. But at the time, that is where he was stationed there, right? That wasn't his home. Well, he was stationed there for some time. He had been there, what, two years? I'm sorry? He had been there about two years? Yes, Your Honor, two years, yes. But we don't have a factual record to expand on the particular question of intent or where somebody intended to stay, nor were we given an opportunity because there was no discovery in the matter, at least on that particular point. But the defendants filed these 12B6 motions in New Jersey, never raising California law. And if it was their intent to challenge this under California law, then I believe they should have raised it at the time in New Jersey. Certainly, I don't necessarily agree. I know that this court recently issued a decision in the Mikheov v. Trump University case, which deals with the whole notion of whether this anti-SLAPP falls within procedural or substantive procedures, such that, you know, where it falls under the line of Erie v. Tompkins. But at the time, accepting as it is the law in the Ninth Circuit, then the defendants were free to raise the issue, assuming it was substantive. They were free to raise that issue in New Jersey when they filed these extensive motions under 12B6 and there are other motions to dismiss that were originally filed in the case. But even putting that aside, once the case was transferred to the California district, they still didn't file these motions for several months later until February of 11. The case was transferred in November of 10. So you still have the question of whether the defendants could establish good cause for why they waited so long to file the motion. And, you know, we made the point in our brief of saying it's sort of like laying in the weeds on an issue that they thought was of paramount importance to them and as a protection to them that they never raised until it got to California. But putting that issue aside on the transfer, I believe that it was an abuse of discretion to grant the untimely motions. The district court applied too high of a standard under the anti-SLAPP, under California's anti-SLAPP law. You know, this case has sort of taken this turn about First Amendment protections. I would respectfully disagree that this is not really a First Amendment battle at this stage. It's simply a vehicle for dismissal of cases on an early basis that don't meet a minimum standard, a minimum threshold. And this court has many times looked at and reviewed the anti-SLAPP statute under California. California's anti-SLAPP statute was designed to throw out lawsuits that did not even meet a minimum threshold. That's a minimum burden. And in this court's opinion in the Hilton v. Hallmark case, this court indicated that it's only a very low minimum burden. Now, the district court found that we satisfied that burden in her tentative ruling and then changed her mind, which to me only shows that there's further evidence of the fact that we presented enough evidence to survive the anti-SLAPP motion. But before we get to that part, there's two steps in the anti-SLAPP statute that have to be satisfied. It's a burden-shifting analysis, as we all understand. And the first prong is that the defendants have to prove that they had engaged in protected conduct that was, quote, in connection with a public issue. I don't believe that there's any challenged conduct in this case that deals with a public issue. Now, the defendants say this is about the Iraq War. I don't think the movie is about a public issue because we define that, and the California courts define that really broadly. So certainly the movie was something of public interest, both the subject and the movie itself. Well, I agree that the war was of public interest, Your Honor. However, the California courts have looked at the challenged conduct, the specific challenged conduct. In the Dyer case is a prime example that we have cited in our brief. It's Dyer v. Childress. And in the Dyer case, the court said you don't look at the broad picture that this is a movie about the war. You look at the specific challenge. I don't understand that part of your argument. Because Dyer, it was the use of this person's name for a random character. The other ones that you cited, the Whitaker and the Doe case, again, it was like one instance of identification. This person is HIV positive or this person will reveal his identity. Whereas in this case, it seemed like the whole movie was at least inspired by what the reporter had observed in his 30 days with the unit. And so I was having trouble making that connection. So maybe you can explain that. Sure, Your Honor. I don't believe that there's any tension between those cases. What we're dealing with is simply a standard, and the court has applied the standard to different cases. Now, in Dyer, the court said, and in Doe, the Doe case, and the Whitaker, the Whitaker v. A&E case, the court said, what is the challenge conduct that you're complaining about? And in our case, it is the misappropriation of my client's life story and his persona. That's the challenge conduct. And then they asked, is that connected to the public issue that the defendants are proffering, the Iraq War? No. The answer to that, I'm sorry, respectfully, the answer to that is no. What would the movie be without those elements, though, if there wouldn't be a movie, right? Well, I would disagree. I mean, I agree that the movie was used as a vehicle, but the movie was used as a vehicle to portray my client's life story. I mean, if the defendants went over to Iraq to be embedded with the military, Mr. Bull was looking for a story, and he found one in my client's life, my client's persona, his relationship with his family, his mannerisms, his habits. That's the challenge conduct. And that challenge conduct has nothing to do with the Iraq War. Whether my client is sitting in Wisconsin or in New Jersey or if he's sitting in Iraq, those are the particular challenges to his persona that were misappropriated. Well, it's also how his persona related to what he was doing over there. Well, that could be it. Well, I mean, that's the whole point of the movie. Okay. Your Honor, I don't agree that the movie was used as a vehicle. However, it was my client's persona and life story that was misappropriated. Why does the public— In connection with what he was doing over there in Iraq. Right, in connection with what he was doing. But why does anyone in this room have to know how my client showers or how he communicates with his family or what he says to his son? Why does anyone have any interest in knowing that? That, respectfully, is not a public interest. And those cases in Dyer and Doe, and Doe does a very good job of— Movies are stories about people. I mean, that's just the fact of the matter. People are interested in seeing a story about a person, not a history lesson. Well, right, but the First Amendment doesn't protect an individual. It generally protects movies about people, right? I believe it protects the making of movies, but I don't believe it protects the misappropriation of someone's particular life story to make that public. Let's assume that they get over this first step, move on to the second, in their anti-slap motion. Right, well, okay, assume that it meets the test under public interest, then we move on to the second step, which is we simply have to make a minimum showing of a prima facie case, and we have done that in the district court. Now, I fault the district court for going further beyond that prima facie showing and saying, well, I'm going to now look at the transformative use defense and apply that. Well, the transformative use defense, as this court noted in the Hilton case, is an affirmative defense, and just procedurally so the court understands, there has never been any assertions of any affirmative defenses in this case because they filed the 12b-6 motions right out of the gate. Nobody ever filed any affirmative defenses in the case, and respectfully, that affirmative defense, the transformative use, is a fact-driven defense that is based upon discovery and particular factual disputes. Now, the district court said in her tentative ruling that we met that threshold and that transformative use didn't apply. Now, changed her mind, of course, and that's the prerogative of the court, but in the final ruling changed her mind and said transformative use does bar that. Well, there was never any discovery, and as far as the record that was submitted for every assertion of fact that the defendants made as to the transformative elements, we had competing inferences and competing facts in our declarations. So I believe that we were put into a fact-finding contest in which the record hadn't been developed, and as we know, the anti-SLAPP statute doesn't allow for discovery. Now, in Metabolife, this court back in 2001, Judge Hawkins wrote, that that doesn't conform with federal procedural rules to not have discovery, which goes back to the Trump University case, which Your Honor is familiar with, that begs this question of how can you reconcile these procedural protections or these procedural rules of state court with the federal court? You can't reverse-engineer it and then say, well, we can make sense of this in the reverse now that there wasn't discovery. If we were going to be placed in the fact-finding contest, then we should have been allowed the opportunity for discovery to flesh out those factual disputes. Now, at the district court, the record was simply these facts are different, these facts are the same between the movie and my character. Well, that's a fact contest. The court has aptly noted that the transformative use defense is a question of fact. Well, if it's a question of fact, we've gone well beyond now the requirements of anti-SLAPP and us proving a prima facie case. We've gone well beyond that into this realm of fact-finding, transformative use, and the cases from California that have applied transformative use have done so generally in the summary judgment standard after discovery was taken. There's only a few cases where transformative use was applied, and it was denied in the no-doubt case, which is cited in my brief, no-doubt via activism or activision. And in that case, the court said, look, we're not comfortable. We can't say that this is a matter of fact, that this defense prevails. Well, that's all we have to do in the anti-SLAPP context is satisfy this minimal showing, and I believe that we did that. I believe the district court set that hurdle too high. What is the relief that he's seeking? I'm sorry, the ultimate relief? Well, he's seeking damages under California law, tort law, damages for misappropriation. But how do you measure those damages in his case? I mean, he wasn't a famous, you know, most of these misappropriation cases deal with famous celebrities. Well, there are different cases that talk about how you. . . What are you seeking here? Well, there's different cases that talk about how you measure damages in the case. Some of them are disgorgement of revenues. Some of them are percentages of revenues. California has a certain statute that governs the damages that are available in cases like this. But is it your theory that his story had a certain value or his . . . Yes, I believe that his story and his life did have a value, and that's supported by what the Supreme Court has said, is that nobody has a right to misappropriate for free somebody else's personal life story. I think if you're talking about Zucchini, there was a specific performance. So this was an entertainer. He had a performance. The whole performance was performed, and then by filming it, the court said, this is a narrow carve-out from the First Amendment because it ruins the value of his performance. What value of the 30 days of Sergeant Sarver in Iraq that he had created and invested economic goodwill in was ruined by the movie? Well, I believe the value was the commercial value that was obtained by the defendants. Was he planning to exploit the economic value of that 30 days? Well, Your Honor, I don't believe that that question could be answered by the record, but to the extent that my client didn't know about this, he had objected to it before this was ever published, and he objected to the Playboy article. In fact, he spoke to the JAG officers about his remedies of stopping that Playboy article. So it wasn't like he just waited, and he was somewhere off in the wings and then said, well, gee, these guys made this movie that's become very popular, and it's done very well, and it's won these awards. Now I want to do something about this. He tried to stop it every step of the way. Now I believe those are all factual, again, factual disputes that go to. . . But Zucchini and Comedy 3, both on the federal and the state side, they said it's not a question of censorship. It's a question of who gets the money from publicizing their performance or using their identity that they've developed as a celebrity. And so I was having difficulty lining that up with what Sergeant Sarver might have been thinking about his 30 days there. Well, Your Honor, I believe that the court's question, it's intuitive, but I believe it's premature at this stage to try to figure out what his potential damages or what his intents would have been, although what we know is that he objected to the making of this. This was a misappropriation of his life story, his relationship with his family, his son, his mannerisms, his personal acts, what he did outside of his Army job. And that obviously had some commercial value to the defendants because, as I said before, Mr. Bull went over there and he found the story, apparently, that he was looking for in my client's life, not somebody else's. It wasn't like a docudrama or documentary where they just said, this is what's going on in Iraq, this is what happens on a daily basis. I mean, the movie was about this particular character. One of the amici says, well, that would mean, under the rule that you're suggesting, you could never have an unauthorized biography. They would all be able to be censored or to be prevented. Do you agree with that? I don't agree with that. What's the difference between an unauthorized biography about somebody's life, whether living or dead, and what the movie did? What's the difference? Well, I believe that question, it calls upon a couple different subjects. One, whether we have public figures or private figures. Now, the courts have fashioned different tests for what satisfies First Amendment and what does not satisfy First Amendment. And they look at, is it for defamation? So you're talking about your defamation claim or your right of publicity? Well, I'm talking about just both in general. Well, just talk about the right of publicity claim for now. Well, the courts have fashioned a test as to what was misappropriated? What were the similarities? How similar were they? And then, beyond that, did you take any pieces and then change those to make them defamation or defamatory? And did you cast those in a false light? So the courts looked at what are the particularities of the case, of the conduct, the speech. Now, if it's a public figure, it's obviously different. As the court in the Hilton case decided, public figures are governed by a different standard. Now, the district court in this case said that my client was a public figure. And we respectfully and very strongly disagree with the assertion that my client somehow voluntarily injected himself into this particular controversy. He was advised and told, as a member of the armed services, that this is what he was to do. He was supposed to protect Mr. Bull. He was supposed to be there to allow him to follow him, to watch him do his job. He didn't voluntarily inject himself. So I believe that the standard is different based on whether someone's a public figure or whether they're a private figure. My client was purely a private figure in the armed services doing his job. I don't believe that there should be any lower threshold or lower standard for Your Honor to answer your question about what are the likenesses or what are the similarities. If you misappropriate the particular similarities of someone's life to the extent that those things would only be known by your personal knowledge, then you've satisfied that test. Counsel, you're down to about a minute and a half. Do you wish to reserve? Yes, Your Honor. I would like to reserve the remainder of my time. Thank you. We'll hear from the other side. Good morning. May it please the Court. My name is John Jamison Hill. I represent several of the appellees. With me is Jeremiah Reynolds and David Halberstadter. They represent the other appellees. With the Court's indulgence, we've split the issues here to discuss so that we're not repeating ourselves. And I'd like to start where the appellant started, and that's with the choice of law issue. And as the Court recognized, the district court here used the more general Section 145 standard to determine whether California law applied or whether some other jurisdiction's law should apply. An appellant has argued that he's entitled to certain presumptions here, and one of the sections he looks at is Section 150. That's the multi-state defamation standard. Well, do you agree that 150 applies? I do not agree that 150 applies. And the reason for that is we don't have the typical multi-state defamation case here where it's published to all states at the same time. Here you have a limited release in Los Angeles and New York domestically. It had been released outside the United States before. And the appellant concedes. He went to see it in New York. He didn't see it. That may have been where he first saw the movie, but that's just not where the limited area, the limited locale where he suffered any harm. Well, we also have another issue. It's broader from his perspective. We have another issue here because I agree. Well, let me read from 150, which I think needs to be reviewed, and that is, when a natural person claims that he's been defamed by an aggregate communication, which presumably this is, the state of the most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state. Why doesn't that apply? Well, for two reasons. And the first is the domicile issue, which the Court's already raised. I will get to that in a moment. But the second is that the appellant here gave very specific reasons for injury. And you can find those in the record. I believe there are excerpts of record, page 125. He lists about five of them. And many of them are issues and injuries that could not have occurred in New Jersey. He talks about having a bull's eye on his back when he goes in theater to perform his job in a war zone. He talks about the fact that he's been deprived of, potentially deprived of, job promotions by JSOC. And again, he was outside of New Jersey very quickly after the movie was released. So that's another injury that probably did not occur in New Jersey, or at least there's no facts to support that. But wouldn't the issue of domicile be a question of fact to be resolved by a fact finder? It would be, although here there are no facts to support that his domicile was New Jersey. We have a member of the armed forces. He is not there voluntarily. He's there because of orders. And as we see from the record, he is transferred very quickly out. He has no choice to be there. It was an issue that the appellees raised in their motion. He certainly had a chance to develop those facts that would show domicile, whether he's a registered voter in New Jersey, whether he has a New Jersey driver's license, whether he intends to stay in New Jersey. And the one fact he was able to point out here, two years he claims that he was in New Jersey, is nowhere in the record. There's no facts to support that. He's thrown it into his brief as a fact, which is improper. He had the opportunity to provide those facts. Those types of facts are solely within his knowledge, his understanding. He didn't need discovery to do them. Could have presented them to the court, and he chose not to. So based upon the record in front of the court, the court had no facts to establish that New Jersey was his domicile. The court fell back to the more general standard, looking at that four-factor test that's in Section 145, and determined that California had the most significant relationship with the parties in the occurrence at issue here. Why didn't you file the anti-SLAPP statute in motion in New Jersey, if you believed then that California law applied? It was premature at that time, Your Honor, because the first issue was jurisdiction and venue to be addressed, and I agree. Everything just gets transferred when the court files its transfer order. It did, and really there's, in the grand scheme of the case, although there was time between when the case was filed and when that anti-SLAPP motion was actually heard, there's really nothing that changed in the course of the case, except that it was transferred to California. There were no other substantive decisions besides the finding that the case belonged in California. As the appellant pointed out, there wasn't a lot of discovery done. No other motions made. It really made no difference, and the case law is very broad on that timing issue. The statute says, may do it within 60 days. It's within the court's discretion otherwise, and as the case law explains, you really look at the stage the case is at, and here it was in absolutely a preliminary stage. Nothing had been done. It was an appropriate time, and that is an abusive discretion standard, so the appellant would have to develop some very high, very significant error that the court made in hearing it at the time it did. Now, moving on to whether the appellees met their burden of showing that the conducted issue is tied to a public interest, you have a situation where the appellant is trying to greatly narrow the scope of what his claims were, and that's just not borne out by either the complaint or the declaration he put in in opposition to the anti-slap motion. The conducted issue is this idea that the creators of the film misappropriated his entire life story, and you're talking about the missions he went on, the way he dealt with his squad, the way he dealt with the dangers that he faced in theater, and the way that he handled his relationship. The similarities between his actual life and the Playboy article and the movie are overwhelming. I wouldn't say overwhelming, and my colleagues will get to the transformative issue, and there's a lot, at least the appellant, has kind of confused two issues here. There is the question on whether the anti-slap statute applies, and for that analysis you really have to look at how the conduct ties into the actual movie here, and there the similarities come into play. These missions that he underwent. Before you pursue the anti-slap, there seems to be a notion that the residual law would be the law of California, but so many aspects of this movie involved activities first in Iraq, and then presumably in Jordan where a lot of scenes were shot, as well as scenes that were in many other places. Why should it have to be California? Why should we be choosing California law over those places? Because, again, you look at the most significant relationship, and in California that's where the majority of the parties are either domiciled. Well, the defendants are certainly, but you have to also look at it from the standpoint of the plaintiff, do you not? You do. You have to take that into account, but at the same time the actual sections all refer to the parties, so you look at the parties, and you look at the other conduct at issue. Certainly some of the movie was shot outside of California, but pre-production, production, and post-production were done in Southern California, and really that's where the movie coalesced. That's where it was put together. So you do have the most significant portions of the conduct at issue occurring in California. Unless 150 sub 2 applies. If there is proof that he is domiciled there, and even 150 sub section 2, it doesn't say that's an automatic presumption. No, of course not. It says the most significant relationship will usually be. Correct. That's what it says, and it's not here because, again, you have all of these other factors that take that out of the running there for what should have been used. And at this point I know the Court has other questions about transformative use in First Amendment, so I'll turn it over to one of my colleagues here. Very well. Good morning, Your Honors. May it please the Court. My name is David Halberstadt, and I represent the Films Domestic Distributor Summit Entertainment. Before we get to the transformative use issue, I think there are a couple of things that are incumbent upon me to address. First, the appellant's burden in connection with an anti-SLAPP motion. The appellant has tried to characterize that burden as not high, as slight, and as suggesting that only claims that lack even minimal merit should be stricken. Perhaps this is a matter of semantics, but the burden is to demonstrate that the complaint is supported by a sufficient prima facie showing of the facts to sustain a favorable judgment if the opposing party's evidence is credited. It's been equated to the proof necessary for a plaintiff to defeat a motion for summary judgment or a non-suit motion. When you look at what he produced, at least when I look at what he produced, and you look at his claims for relief, at least prima facie, it strikes me that he's met his burden. You come back and you say, ah, we have a First Amendment defense to this which trumps, which clearly trumps his claim, and therefore there's no likelihood that he's going to ever prevail. You should just grant the motion and end this case. I think that is correct, but I also believe, Your Honors, that there is a threshold issue as to whether or not the elements of Sergeant Sarver's persona that he alleges and claims have been incorporated into the motion picture are even elements that California's statutory or common law rights of publicity even recognize as actionable. So before the court even has to turn to the constitutional issue or the issue of the transformative use, I believe there's a threshold question as to whether or not the film made any use of any element of a poet's right of publicity to begin with. If Your Honor is convinced that it has, then I'll just move on. I'm just speaking, I don't, that's my own kind of, when I've looked at what's here, when I look at it, I'm not, I don't. Well, California Civil Code 3344 only covers a person's name, voice, photograph, likeness, or. But we're not limited to 3344. And the common law also covers a person's identity. Now, the cases that have interpreted what the common law covers are those in which a, it's been something more than a name, voice, photograph, or likeness, for sure. But in its application, it's been really limited to the characteristics or attributes usually of a celebrity that are uniquely identifiable. But it's not confined to celebrities. It is not, but they are still factors that have been uniquely identifiable with a particular person. And the cases that we have, that are the only examples that we have where this common law right of publicity has, has been applied in this type of context to something other than a name or a voice or a likeness are the Abdul Jabbar case where General Motors used the basketball player's former name in a television commercial. The Bette Midler and Tom Waits cases in which sound-alikes, because sound-alikes are not covered by voice in the 3340, Section 3344, where sound-alikes mimicking the distinctive singing style of the singers, performing songs that were uniquely associated with those singers were used in commercials. The Vanna White case in which a robot bearing most of the trappings of the, the game show host standing in front of a uniquely identifiable game board was used by Samsung in a commercial. And the Matzenbacher case, which is the oldest one, where the use of a race car that was uniquely identifiable as the race car of the plaintiff was used in a commercial by R.J. Reynolds. So if these are the guidelines, I don't know that they are the limit, but there are no cases going broader than that. If these are the guidelines for what a common law appropriation of an individual's identity are, this case doesn't fit. Didn't use his name, didn't use his voice, didn't use his photograph, didn't use his likeness, and really didn't use anything particularly and uniquely identifiable with this appellant. He used his story. It used elements of his, it incorporated, as most fictional works do, the writer's experiences with a variety of people. The elements that were incorporated into this fictional character are those that primarily are common to bomb disposal technicians in general, members of the armed service in general, and there was nothing really particular. Well, what about the ride-along with the colonel? The colonel asks, Are you the guy in the bomb suit? And is told, No, sir, that's Sergeant James. He asks, James, are you the guy in the flaming car? And is told, Yes. He replies with a wide smile, Well, that's just about hot, so-and-so. You're a wild man, you know that. And then he says he's a wild man, and then he says, I want to shake your hand, which was an absolute replication of what actually happened in this case. And there are a whole bunch of other similarities. Well, and there are also a whole bunch of dissimilarities, and for purposes of, maybe that would be enough for whether he's established a prima facie case. I still don't think so, because I don't think those incidents- Wouldn't there be enough here for a jury question to determine? No, and I'll get to why in a moment, but the answer is no. I do not believe that these incidents and anecdotes are sufficient to constitute a prima facie showing of a violation of right of publicity, either under the statute or under the common law. Well, you didn't file a 12B6. They didn't allege a cause of action. Well, we didn't file that here. We actually filed that in New Jersey, but putting that aside for a second- Failure to state a claim. Is that your position, that he fails to state a claim? Our position is both, that he fails to state a claim, that on the evidence he's failed to establish a prima facie case of violation of either statutory or common law right of publicity, and anyway, even if he had, the First Amendment trumps it as a matter of law. Why? Because the work into which, assuming his likeness or identity had been incorporated, is a fully transformative First Amendment-protected work under the, as a matter of First Amendment law in general, but certainly under the test established by the California Supreme Court in Comedy 3. In fact, and addressing, I think it was Judge Acuda's question about docudramas, in fact, this film could have portrayed Sergeant Sarver identically and called him Sergeant Sarver and titled the film Sergeant Sarver Story and it would make no difference to the transformative use analysis because that's what the First Amendment permits, whether the individual is private or public or otherwise, and if it were not the case, then stories that you see every day in Law & Order, which are ripped from today's headlines, involving private individuals, could not be made if it was incorporating little bits of their story or little things that were drawn directly from the headlines. This work, even assuming it included some portion of the appellant's identity, also incorporated dialogue that had been fictionalized, characters that had been fictionalized, cinematography that was created. How do we square up cases like the Valentino case of Googly Amy, where the California Supreme Court said, we look at Justice Byrd's concurrence, which say you can take a public character even, and I don't see any reason why that wouldn't apply to a private person, and do a story, do their life story, and that's completely protected by the First Amendment. With other cases, like where the California courts have said, even non-celebrities have a right of publicity. I'm having trouble seeing how those two different threads square up. What the right of publicity is intended to protect is the commercial use of a person's name, voice, photograph, likeness, and perhaps identity, not the incorporation of those attributes in an expressive work that's protected by the First Amendment. So the squaring of it is, when you're talking about putting an appellant's face on a box of cereal, you have a big problem. When you talk about telling Sergeant Sarver's story in a First Amendment protected work, just like the docudrama of Valentino, had it been actionable, notwithstanding the fact that he was deceased, and there was no Section 3344.1 at the time, when it's incorporated into a First Amendment work, the California Supreme Court requires that the court at the earliest possible stages in the proceedings, that's why it's appropriate for an anti-slap motion, that the court review the work and determine whether or not the person's likeness was the sum and substance of the work or whether it was only one of the raw materials in which a fully transformative work was otherwise synthesized. And I don't think looking at the motion picture of the Hurt Locker and all of the creative elements that went into it, even if the appellant's likeness was incorporated, is anything other than a fully transformative First Amendment protected work and the First Amendment right prevails. I see I only have another minute left and I want to give time to my colleague to address the defamation issue, if Your Honors have no further questions. He has 56 seconds left. I'm running. Good morning, Your Honors. I will be very brief. There is an article here, the Playboy article, which is expressly about the plaintiff, and yet no one would claim, and no one is claiming, that that's a violation of his right of publicity. Nor has he sued for defamation based on that Playboy article. That came out in August 2005. He didn't file suit over the Playboy article and we know that's about him. Now let me ask you a question. Why is it that no one contests that my client, Bull, can write an article  and that doesn't violate his right of publicity, but if he does a movie that's loosely based... There's a lot of bootstrapping in your argument, Counsel. We understand the point you're making. Okay, thank you, Your Honor. This Court has held that the actual malice standard also applies to right of publicity claims and the reason is, is because there's First Amendment protection undoubtedly involved here and in the Hoffman case, this Court held that the actual malice standard should be applied to right of publicity claims. So whether we use the transformative use test or the actual malice test, there has to be some First Amendment protection that's provided to this motion picture. Very well. Thank you, Counsel. Your time has expired. Thank you. Mr. Desi, you have some reserved time. Yes, thank you, Your Honor. I'm going to brief you with a minute and some seconds. We're not asking this Court to create any new law. I'm not asking Your Honors to find some exception. I'm not asking for some public policy holding. We're simply asking to apply California law as it stands, as the Court is to do in a diversity case and the California cases answer this question. Now, my brother Counsel indicated that, you know, the standard is higher. Writing for this Court, Judge O'Scanlan wrote in the Hilton opinion, the required probability that Hilton will prevail need not be high. That comes from the Navalier case from the California Supreme Court. I'm not asking for any deviation from the standard. Now, the defendants are making much ado about a First Amendment argument. Well, perhaps that might be appropriate on another day, on another motion, on a 56 motion later on in summary judgment. But that's not what we have to satisfy at this point of the lawsuit. It's simply the anti-slap. And I believe that the defendants and the District Court erred by holding this anti-slap standard much higher than it actually is. And also in the Hilton opinion, this Court, Your Honor, wrote, we take no position on whether there is a First Amendment defense to misappropriation of the right of publicity claims. That's in footnote 11 of the Hilton decision. Now, the California Supreme Court has not, since this Hilton decision came out, has not fleshed out any different test on any of these cases that are presented that we've cited. And we believe that these cases cited tell us that there are questions of fact for which the motion should have been denied and we should continue. Unless the Court has any other questions, I see that I'm out of time. Thank you very much, Counsel. Thank you. And thank you for the opportunity. The case just argued will be submitted for decision.
judges: O'scannlain, Paez, Ikuta